360 So.2d 853 (1978)
STATE of Louisiana
v.
Burlon GRAHAM.
No. 61540.
Supreme Court of Louisiana.
June 19, 1978.
Rehearing Denied July 26, 1978.
Lewis O. Unglesby, Baton Rouge, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Marilyn C. Castle, Asst. Dist. Atty., for plaintiff-respondent.
DENNIS, Justice.
Defendant, Burlon Graham, was convicted of driving while intoxicated as a second offender, La.R.S. 14:98, and sentenced to *854 serve a period of sixty days in the parish prison and pay a fine of $350, in default of which he will be required to serve an additional one hundred twenty days. We granted writs to determine whether the trial court committed reversible error by allowing the State to establish a presumption of the defendant's intoxication through the introduction of a chemical analysis of his blood's alcoholic content without presenting prima facie proof of the standard quality of the test chemicals.
The legislature has enacted a system of laws governing tests for suspected drunken drivers. Any person who operates a motor vehicle upon the public highways of Louisiana is considered by law to have given consent to a chemical test of his blood, breath, urine or other bodily substance for the purpose of determining the alcoholic content of his blood if arrested for an offense arising from the operation or control of a motor vehicle while intoxicated. La.R.S. 32:661. If a person refuses to submit to an authorized chemical test at the request of a law enforcement officer having probable cause to arrest him for drunken driving, his license may be suspended for a period of six months. La.R.S. 32:667. In the trial of a drunken driving offense one of two rebuttable presumptions may arise upon the proper introduction of a valid chemical test. The presumptions are as follows: If at the time of the offense there was 0.05 per cent or less by weight of alcohol in the person's blood, it shall be presumed that the person was not under the influence of alcoholic beverages. If there was 0.10 per cent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcoholic beverages. If there was in excess of 0.05 per cent but less than 0.10 per cent by weight of alcohol in the person's blood there shall be no legal presumption but the test results may be considered as evidence in the case. La.R.S. 32:662.
Both our state and federal constitutions oblige the prosecution in a criminal trial to prove beyond a reasonable doubt every fact necessary to constitute the crime charged and forbid the state to shift the burden of ultimate persuasion of an essential element of the crime charged to the defendant. Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); State v. Searle, 339 So.2d 1194 (La. 1976).[1] Under La.R.S. 32:662 the state may be relieved of its obligation to prove beyond a reasonable doubt the defendant's intoxication and thus shift the burden of ultimate persuasion on this essential issue to the defendant. Accordingly, at least two constitutional questions deserving of careful scrutiny are raised by this legislation, e. g., whether there is a justifiable empirical basis for the presumption, assuming complete reliability in testing; and whether the state may erect the presumption against an individual without proof beyond a reasonable doubt of the reliability of all elements of the chemical analysis.[2] We do not reach the constitutional questions, however, because defendant has attacked the validity of the proceedings below on the narrow ground that the trial court allowed the introduction of alcohol content evidence without proof that it was obtained in compliance with the Department of Health regulations for chemical intoxication tests. Nevertheless, because the presumption of intoxication, for all practical purposes, places an impossible burden on even an innocent defendant, the question raised of the admissibility of the chemical analysis which triggers and presumption looms as one involving issues of fundamental fairness.
*855 The legislature and this Court have recognized the importance of establishing safeguards to guarantee accuracy in chemical testing. In the same legislation which authorizes the chemical analysis of a motorist's blood and creates a legal presumption of intoxication in the event his blood contains the requisite per cent of alcohol, the legislature conditioned the validity of the chemical test upon its having been performed according to methods approved by the Department of Health. La.R.S. 32:663.[3] In considering previous attacks upon the validity of the statutory design, this Court has expressed the opinion that, in order for the State to avail itself of the statutory presumption of a defendant's intoxication without violation of his constitutional due process guarantee of a fair trial, detailed methods, procedures and techniques must be officially promulgated to insure the integrity and reliability of the chemical tests including provisions for "repair, maintenance, inspection, cleaning, chemical accuracy, certification [as well as] proof of adherence to" those methods, procedures and techniques.[4]State v. Jones, 316 So.2d 100, 105 (La.1975); cf. State v. Junell,308 So.2d 780, 783 (La.1975).
In response to the constitutional requirements and the legislative mandate expressed by the statute, the Louisiana Health and Human Resources Administration, Division of Health, promulgated methods, procedures and techniques for assuring the accuracy of the tests. See, Rules and Regulations for Chemical Test for Intoxication, 1 Louisiana Register, p. 562 (1975). The rules and regulations are divided into eleven detailed sections which may be described as follows: Section 1. The Division of Health is the successor to the Department of Health; Section 2. Requirement of approval of prototype before use of testing device in the state; Section 3. Designation of the Photo-Electric Intoximeter Model No. 400 as an approved technique or method for testing; Section 4. Procedure for performing analysis of breath specimens; Section 5. Procedure for manufacturers to request approval of testing devices; Section 6. Procedure for maintenance of testing devices chemicals; Section 7. Qualifications and certifications of testing device operators; Section 8. Insurance and renewal of permits to testing device operators; Section 9. Qualifications of blood analysts; Section 10. Methods for blood-alcohol analysis of blood; Section 11. Specification for blood collection kits.
The section pertaining to the maintenance of testing devices, chemical accuracy and the certification and proof of adherence to the regulations with regard thereto, provides:
"6. Maintenance checks will be performed on a routine basis at least once every four months. Items to be checked shall be but not limited to the following:

*856 A. Each lot of ampuls shall be spotchecked and certified by the manufacturer as to their quality. This certificate shall be prima facie evidence as to the standard of the ampul.
B. Clean instrument
C. Calibration check of standard ampuls
D. Running of a known alcohol solution in which results shall be within plus or minus .010g% or the known alcohol value. (See Exhibit C)
E. In the event any repair work is needed, it will be recorded in detail. (See Exhibits D & E)
Repair work will be performed by technicians working for the Applied Technology Section of the Louisiana State Police Crime Laboratory who are certified by the Louisiana Health and Human Resources Administration, Division of Health, Bureau of Laboratories, to perform such maintenance. The Applied Technology Section of Louisiana Police Crime Laboratory shall have the authority to instruct other individuals to perform such maintenance (Exhibit F). Upon satisfactory completion of such training the individual shall be certified to perform maintenance by the Louisiana Health and Human Resources Administration, Division of Health, Bureau of Laboratories.
Records covering maintenance, etc., of the P.E.I. (photo-electric intoximeter) instrument will be kept by the Louisiana State Police Crime Laboratory."
Section 6 of the rules and regulations requires submission of each testing device, and the ampuls of chemicals allocated for use with it, to a routine maintenance check by a certified technician at least once every four months. Because premature opening of an hermetically sealed ampul causes the chemical to deteriorate, the regulations do not provide for a laboratory analysis of each ampul. Instead, the certified technician is merely required to determine if each lot of ampuls has been spotchecked and certified to be of standard chemical quality by, the manufacturer. According to the regulation, the manufacturer's certificate that a sample of ampuls spotchecked were of standard chemical quality constitutes "prima facie evidence" of the standard chemical quality of the lot of ampuls from which the sample was taken. This procedure is somewhat similar to one which has been recommended and, in substance, approved in other states whereby all chemicals are received in numbered lots and stored with proper care under the supervision and control of a local chemist, who conducts spot tests of portions of each lot, so that when a contested case is presented in court he will be available to testify that the particular lot, from which the chemicals used in a particular case were taken, were of proper composition, strength and volume at the time the test in question was conducted.[5] Although the procedure noted in other states is preferable because it assures, through periodic spotchecks, that the accused will be tested with recently certified chemicals, the method adopted by the Department of Health reasonably assures that the chemicals were of standard quality at the time they were received from the manufacturer. Since the defendant has not attacked the regulation, we will assume for present purposes that there is a sufficient rational basis for a court to consider the manufacturer's certification as prima facie proof of standard chemical quality at the time an accused is subsequently tested for the concentration of alcohol in his blood. [6] Accordingly, under the regulation as written, *857 the State may establish prima facie proof of the chemical accuracy of the test in question by presenting in court the manufacturer's certificate as to the spotcheck and the standard chemical quality of the lot of ampuls involved in the analysis to be introduced into evidence.
It is undisputed that in the instant case the State did not lay a foundation for the introduction of the chemical analysis by presenting a manufacturer's certificate of spotchecking and standard chemical quality as provided by Section 6 of the Department of Health regulations. The attorney for the prosecution argues, however, that the failure to do so is not reversible error because chemical accuracy was guaranteed through another procedure and because any error was rendered harmless due to substantial independent evidence of intoxication.
Section 4(B)(3) of the Rules and Regulations promulgated by the Department, which is part of a "photo-electric intoximeter checklist" that must be conducted by the operator of the testing device before making a chemical analysis, provides:
"Preparation of the instrument whereby temperature is checked and the ampul to be used in such analysis is checked to show it is within a certain tolerance plus or minus 0.10g%. This is to insure a good ampul will be used in the analysis."
In the instant case the operator of the testing device testified that he performed this step in the checklist as provided, and the able attorney for the State argues that this procedure alone is sufficient to insure the accuracy of the test chemicals.
We cannot agree because the ampul check provided by Section 4(B)(3), relied on by the State, appears to be merely a partial, secondary check on chemical quality to be performed immediately before an intoximeter test is run in the field to determine the alcohol content of a suspect's blood. This expedient precaution does not entail laboratory analysis by a chemist for proper chemical composition, strength and volume. It simply calls for the operator of the testing device, usually not a chemist, to check the ampul to be used in an alcohol concentration test against a "comparison" ampul contained in the same lot to see if they produce similar photo-electric readings on the intoximeter. If deterioration or damage has affected the "comparison" ampul, obviously such an intra-lot test would not assure chemical accuracy of the measurement of alcohol concentration in a suspect's blood. On the other hand, the requirement of a manufacturer's certificate by Section 6 of the Department's regulations and the procedures of other jurisdictions envision a thorough analysis of chemicals by a chemist under laboratory conditions. [7] Therefore, we conclude that under the officially approved technique or method for testing by photo-electric intoximeter, the manufacturer's certificate of chemical quality based on its laboratory tests of a portion of the ampuls constitutes the primary assurance an accused has that the chemicals will provide an accurate analysis of the alcohol content of his blood.
The failure of the prosecution in the instant case to produce a manufacturer's certificate or other form of prima facie proof of standard chemical quality of the test chemicals cannot be excused as an inconsequential departure from the painstaking methods, techniques and procedures formulated by the Department in response to an act of the legislature and the decisions of this Court. If the lot of chemicals involved in the test was of inferior quality it is possible that a practically conclusive presumption of guilt was brought to bear against an innocent person. A conviction obtained through chemical test legislation, which not only destroys a defendant's presumption of innocence but also severely restricts any possibility of a defendant proving his innocence, must be reversed if not accompanied by all of the safeguards designed to insure reliable chemical analysis. The proof of the standard quality of chemicals used in the test by which the State seeks to set up the presumption against the *858 defendant is crucial to a fulfillment of the defendant's constitutional due process guarantee and therefore must be educed in strict compliance with the standards promulgated in response to the decisions of this Court. See, State v. Jones, supra; State v. Junell, supra.
The wrongful introduction of a chemical analysis which by law presumed the defendant to be under the influence of alcohol at the time of his arrest was manifestly prejudicial to the defendant's case. Although other independent evidence of intoxication was presented by the State at the trial of the case, we are prohibited by the constitution from deciding the factual question of guilt or innocence and must restrict our scope of review to questions of law in criminal cases. La.Const.1974, Art. 5, § 5. Consequently, we cannot speculate as to what decision the trier of fact would or should have made had the inadmissible evidence not been introduced. Instead, we are required to review the record for reversible errors of law and to declare them when found. State v. Burnette, 353 So.2d 989 (La.1978).
For the reasons assigned, the defendant's conviction and sentence are reversed and the case is remanded for a new trial consistent with this opinion.
TATE, J., concurs, pending further showing that the testing of the ampuls at the time the subject is examined by the machine adequately assures the reliability of the test chemicals used.
SANDERS, C. J., and SUMMERS and MARCUS, JJ., concurs.
NOTES
[1] See, Ashford and Risinger, Presumptions, Assumptions, and Due Process in Criminal Cases: A Theoretical Overview, 79 Yale L.J. 165 (1969). See also, Note, 37 La.L.Rev. 1155 (1977).
[2] A number of jurisdictions have upheld the validity of presumptions established by chemical test legislation. Johnson v. State, 487 P.2d 1005 (Okl.Cr.1971); State v. Childress, 78 Ariz. 1, 274 P.2d 333, 46 A.L.R.2d 1169 (1954); State v. Johnson, 42 N.J. 146, 199 A.2d 809 (1964); State v. Simonsen, 252 Minn. 315, 89 N.W.2d 910 (1958); Seattle v. Bryan, 53 Wash.2d 321, 333 P.2d 680 (1958).
[3] La.R.S. 32:663 provides:

"Chemical analyses of the person's blood, urine, breath or other bodily substance, to be considered valid under the provisions of this Part, shall have been performed according to methods approved by the Department of Public Safety and by an individual possessing a valid permit issued by said department for this purpose. The Department of Public Safety is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the department."
Subsequent to defendant's trial, the statute was amended to provide that the methods or techniques shall be approved by the Department of Public Safety. See La. Acts 1977, Act 533, § 1.
[4] Other state courts have required that the state produce prima facie proof of compliance with similar basic requirements before the introduction of chemical tests. E. g., in State v. Baker, 56 Wash.2d 846, 355 P.2d 806, 809 (1960), the Supreme Court of Washington set forth the prerequisites as prima facie evidence "(1) That the machine was properly checked and in proper working order at the time of conducting the test; (2) that the chemicals employed were of the correct kind and compounded in the proper proportions; (3) that the subject had nothing in his mouth at the time of the test and that he had taken no food or drink within fifteen minutes prior to taking the test; (4) that the test be given by a qualified operator and in the proper manner." (Emphasis added) Hill v. State, 158 Tex.Crim. 313, 256 S.W.2d 93 (1953); cf., State v. Miller, 146 N.W.2d 159 (N.D.1966).
[5] See, Donigan, Chemical Tests and the Law, 71, 279-80 (1966). Cf. Penny v. State, 410 P.2d 553 (Okl.Cr.1966); State v. Miller, 146 N.W.2d 159 (N.D.1966); Ward v. State, 169 Tex.Cr.R. 589, 355 S.W.2d 839 (1960); City of Wichita v. Showalter, 185 Kan. 181, 341 P.2d 1001 (1959); Hill v. State, 158 Tex.Cr.R. 313, 256 S.W.2d 93 (1953) (reversal based in part upon the fact that there was no showing that chemicals were compounded to the proper percentage); Fluitt v. State, 169 Tex.Cr.R. 259, 333 S.W.2d 144 (1953).
[6] Judgment must be reserved for a future case with a proper record as to whether the potential for chemical damage or deterioration is sizeable enough to require periodic local spotchecking in order to afford the State prima facie proof of current chemical accuracy.
[7] See footnote 5, supra.