490 So.2d 490 (1986)
STATE of Louisiana
v.
Eric J. FAIRLEIGH.
No. KA 4611.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 1986.
*491 Tilden H. Greenbaum, III New Orleans, for appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., A. Hammond Scott, Asst. Dist. Atty., New Orleans, for appellee.
Before CIACCIO, WILLIAMS and HUFFT, JJ. Pro Tem.
CIACCIO, Judge.
Defendant, Eric J. Fairleigh, was charged with the offense of causing "the death of one Nora Lewis, while operating a motor vehicle under the influence of alcoholic beverages". R.S. 14:32.1. Following the hearing on pre-trial motions, the defendant withdrew his prior plea of not guilty and entered a plea of guilty as charged while reserving his right to appeal the court's ruling on the motion to suppress the evidence. State v. Crosby, 338 So.2d 584 (La.1976). The trial court sentenced the defendant to serve five years at hard labor. The sentence was suspended and the defendant was placed on five years active probation with the special conditions that he serve six months in Orleans Parish Prison, pay restitution of $2700, a criminal court fund assessment of $500 and $80 court costs. He was also prohibited from driving except for work purposes.
*492 On appeal the defendant alleges two assignments of error. Finding merit in the defendant's first assignment we reverse the judgment of the district court on the motion to suppress the evidence, vacate the conviction and sentence and remand the matter for further proceedings consistent with this opinion without reaching a consideration of the second assignment of error.
The facts presented at the hearing on the motion to suppress the evidence, are as follows:
New Orleans Police Officer Bill McNabb of the Traffic Fatality Unit testified that on September 23, 1984 he was called to Lakeshore Drive in the vicinity of the Mardi Gras Fountain in order to investigate a traffic fatality. Upon his arrival, Officer McNabb was met by Officer Wheat and a Levee Board officer, who informed him that the defendant was the operator of the vehicle involved in the accident. Officer McNabb observed a covered body at the scene of the accident. He thereafter approached the defendant who was seated in the back of one of the police cars at the scene of the accident. Officer McNabb asked Eric Fairleigh whether he was the operator of the vehicle involved in this accident. When the defendant responded affirmatively, Officer McNabb thereafter advised him of his constitutional rights. The defendant was asked to produce his operator's license and was questioned as to the accuracy of the information contained on the license. The aroma of alcohol was detected on the defendant's breath and he was observed to sway as he stood near the police car answering the questions. Fairleigh was placed under arrest for operating a vehicle while intoxicated. A field sobriety test was administered which the defendant was not able to pass. A breath test was not administered.
Thereafter Fairleigh was informed of his rights regarding chemical testing. The defendant indicated that he understood and he agreed to the blood test by signing the written consent forms.
Thereafter, Dr. Muller, who had been called to the scene because of the severity of the accident, withdrew blood from the defendant.
The defendant indicated that he would be willing to give a statement regarding the accident. Fairleigh was transported to the Fatality Unit Office of the New Orleans Police Department. He was advised of his constitutional rights and he thereafter gave a detailed description of the events surrounding the accident.
Assignment of Error No. 1
Through his first assignment of error the defendant contends that the trial court erred in denying his motion to suppress the evidence.
The defendant filed a written motion to suppress the evidence wherein he contends that his consent to the removal of blood was not knowingly given in that he was not advised of the consequences of giving the blood sample.
On the trial of a motion to suppress the evidence, the state has the burden of proving the admissibility of any evidence seized without a warrant. C.Cr.P. Art. 703.
The statutory provisions concerning test for suspected drunken drivers provides for a presumption of an implied consent to the administration of chemical test under certain circumstances. R.S. 32 Sec. 661 through R.S. 32 Sec. 669, at Sec. 661:
Part XIV. Tests for Suspected Drunken Drivers
R.S. 32 Sec. 661. Operating a vehicle under the influence of alcoholic beverages; implied consent to chemical tests; administering of test and presumptions; effect of refusal to submit to tests; informing person of consequences of refusal and his rights; furnishing information to person tested
A. Any person who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of R.S. 32:662, to a chemical test or tests of his blood, breath, urine or other bodily substance for the purpose of determining the alcoholic content of his blood if arrested for any offense arising out of acts *493 alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while believed to be under the influence of alcoholic beverages. The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle upon the public highways of this state while under the influence of alcoholic beverages. The law enforcement agency by which such officer is employed shall designate which of the aforesaid tests shall be administered.
B. Any person who is dead, unconscious or otherwise in a condition rendering him incapable of refusal shall be deemed not to have withdrawn the consent provided by Subsection (A) of this section, and the test or tests may be administered subject to the provisions of R.S. 32:662.
C. (1) When a law enforcement officer requests that a person submit to a chemical test as provided for above, he shall first read to the person a standardized form approved by the Department of Public Safety and Corrections. The department is authorized to use such language in the form as it, in its sole discretion, deems proper, provided that the form does inform the person of the following:
(a) His constitutional rights under Miranda v. Arizona;
(b) That his driving privileges can be suspended for refusing to submit to the chemical test; and
(c) That his driving privileges can be suspended if he submits to the chemical test and such test results show a blood alcohol level of .10 percent or above. (2) In addition, the arresting officer shall, after reading said form, request the arrested person to sign the form. If the person is unable or unwilling to sign, the officer shall certify that the arrestee was advised of the information contained in the form and that the person was unable to sign or refused to sign.
In this case the investigating officer, Officer McNabb, observed the body of the victim at the scene of the accident. Defendant was observed as exhibiting a swaying type motion when he exited the police car. Upon being questioned, the subject, who was coherent, admitted being the operator of the motor vehicle, and the defendant was then advised of his Miranda rights. The officer requested the defendant's operator's license and during the course of conversation regarding the information on the license, the policemen detected the aroma of alcohol on the defendant's breath.
The defendant was placed under arrest. He was given a field sobriety test wherein his balance and ability to walk were tested. He did not pass this test.
According to the investigating officer, a fellow officer advised the defendant of his rights relating to chemical testing and the withdrawal of blood. He was also advised, by Officer McNabb, that if the blood test showed him to be intoxicated that he could be charged with vehicular homicide in addition to the offense of driving while intoxicated.
The defendant was presented with the standard document which accompanies the blood test kit. According to McNabb the form included a provision advising the defendant that he had the right to have an independent test of the blood sample conducted. McNabb also indicated that the form contained provisions that the results of alcoholic content percentage of .10% or above and any refusal to take the test would be used against the defendant in court. Additionally there was a provision that the refusal to take the chemical test may result in loss of vehicle registration and license. It appeared to Officer McNabb that the defendant understood his rights and he agreed to waive them. Defendant signed the Right to Chemical Testing form.[1] The blood sample was thereafter extracted by a Dr. Muller who was on the scene due to the severity of this incident. *494 The sample was extracted in the presence of Officer Barrios and Officer McNabb.
Under these circumstances the State presented evidence that the test was administered at the direction of an officer having reasonable grounds to believe that the person driving the motor vehicle was doing so under the influence of alcohol in that the officer detected the aroma of alcohol on the defendant's breath and observed the defendant as he exhibited unbalanced movements in his attempts to stand and walk. R.S. 32:661(A). Although the rights form, presented to the defendant before the withdrawal of the blood sample, apparently informed the defendant of the consequences of his refusal to submit to the test and of the consequences if the test results evidenced a blood alcohol level of .10% or above, there was no evidence presented which would indicate the form advised defendant of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) nor is there any evidence that the form was read to the defendant. R.S. 32:661. Accordingly, because of this noncompliance with the requirements for the use of the implied consent provision of R.S. 32:661, we conclude that the consent of this defendant cannot be presumed. Thus, we must decide whether, under the facts presented, the defendant actually consented to the giving of his blood sample.
Generally, the test for consent is whether the defendant acted voluntarily without coercion. State v. Clark, 446 So.2d 293 (La.1984) citing Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In such instances "the state need not establish an `intelligent waiver' of the statutory right to refuse the test, but need only show that he acted voluntarily. State v. Clark, supra. The trial court's findings in such matters are entitled to great weight and will not be overturned when supported by the record. State v. Clark, supra.
As previously discussed, the defendant was advised of his rights and also of the various consequences of taking and refusing the chemical test. He was coherent at the time and appeared to understand his rights. He appeared to have read the consent form and freely signed it before submitting to give a blood sample. The record supports the apparent finding of the trial judge that his defendant's consent was given voluntarily without coercion. The defendant's objection to the admissibility of the test results on the basis that he did not knowingly consent to the search is without merit.
At the hearing on the motion to suppress the evidence, the defendant further objected to the admissibility of the evidence on the grounds that the State failed to present the proper predicate for the introduction of the blood test results because the State failed to show that the State promulgated and strictly complied with regulations which would insure the integrity and reliability of the blood test.
At the time of this incident, in 1984, the applicable regulations governing the acceptable methods and techniques for blood alcohol analysis were as follows:
R.S. 32 Sec. 662. Administering chemical test; use of results as evidence
A. The chemical test or tests as provided for by this Part shall be subject to the following rules and shall be administered as provided for hereafter:
1. Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of alcoholic beverages the amount of alcohol in the person's blood at the time alleged as shown by chemical analysis of the person's blood, urine, breath or other bodily substance shall give rise to the following presumptions:
a. If there was at that time 0.05 per cent or less by weight of alcohol in the person's blood, it shall be presumed that the person was not under the influence of alcoholic beverages.

*495 b. If there was at that time in excess of 0.05 per cent but less than 0.10 per cent by weight of alcohol in the person's blood, such fact shall not give rise to any presumption that the person was or was not under the influence of alcoholic beverages, but such fact may be considered with other competent evidence in determining whether the person was under the influence of alcoholic beverages.
(c) If there was at that time 0.10 per cent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcoholic beverages.
B. Percent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred cubic centimeters of blood.
C. The foregoing provisions of this section shall not be construed as limiting the introduction of any other competent evidence bearing upon the question whether the person was under the influence of alcoholic beverages.
This section has no application to a civil action or proceeding.
R.S. 32 Sec. 663. Approval of testing methods by Department of Public Safety
Chemical analyses of the person's blood, urine, breath or other bodily substance, to be considered valid under the provisions of this Part, shall have been performed according to methods approved by the Department of Public Safety and by individuals possessing a valid permit issued by said department for this purpose. The Department of Public Safety is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the department.
R.S. 32 Sec. 664. Persons qualified to make test
A. When a person submits to a blood test at the request of a law enforcement officer under the provisions of R.S. 32:662, only a physician, registered nurse, qualified technician or chemist may withdraw blood for the purpose of determining the alcoholic content therein. This limitation shall not apply to the taking of breath specimens.
* * * * * *
Additionally, the applicable regulations of the Department of Public Safety controlling blood alcohol analysis were those published in Volume 6, No. 11 of the Louisiana Register of 1980, which provided, in pertinent part:
11. All persons seeking to be authorized to conduct blood analysis shall:
a. Make application to the Department of Public Safety for permit.
b. Have a bachelor of science in chemistry, physics, biology, zoology, medical technology, or a related field.
c. Conduct proficiency testing set up by the State Police Crime Laboratory.
12. The methods approved for blood-alcohol analysis of blood are:
a. Gas Chromatography
(1) Headspace sampling with internal standard.
(2) Direct injection with internal control.
b. Permits shall be effective when issued for a period of five years from the date inscribed thereon. Permits shall be renewed by making application to the Louisiana Department of Public Safety.
c. Procedures shall include the following controls in conjunction with each batch of samples analyzed:
(1) A system blank analysis.
(2) Analysis of a suitable reference or control blood sample of known alcohol content within the range of 0.01 to 0.30 g/dl; the result of which analysis must coincide with the known blood alcohol value of the reference specimen with 0.01 g/dl if validity is to be assigned to the results for the batch analyzed.
d. Replicate analyses shall be performed in order to minimize the possibility of undetected errors.
e. Results shall be expressed in terms of percent W.V. (grams per deciliter) that *496 is, grams of alcohol per 10 milliliters of blood, rounded downward to the second decimal place; for example 0.237 g/dl found shall be reported a 0.23 g/dl or 0.23 percent.
f. Analytical procedures for determining alcohol in blood shall meet the following performance requirements:
(1) The accuracy and sensitivity of the procedure shall be such as consistently to attain results within 0.01 g/dl of the known value over the range of 0.00 to 0.30 g/dl in analyses of appropriate reference materials of known ethyl alcohol concentration.
(2) The precision of the procedure shall be such as consistently to attain a standard deviation not greater than 0.003 g/dl in replicate analyses.
(3) The blank values yielded by the procedure in analyses of alcohol-free blood specimens consistently shall be not greater than 0.01 g/dl.
(4) The specificity of the procedure shall be adequate and appropriate for the analysis of biological specimens for the determination of the blood alcohol concentration in traffic law enforcement and highway crash investigations:
a) Procedures for the analysis of biological specimens from living subjects shall respond only to ethyl alcohol and the other lower aliphatic alcohols and should not be susceptible to significant unrecognized interference by other substances.
b. Procedures for the analysis of postmortem biological specimens shall respond only to ethyl alcohol and shall not be susceptible to significant unrecognized interference by other substances.
13. Blood drawn for the purpose of determining the alcoholic content therein shall have been taken with the contents of the "B-D Blood Alcohol Kit: No. 4990 or No. 4991 for postmortem determination (manufactured by Becton-Dickinson Division of Becton, Dickinson and Company, Rutherford, New Jersey), or similar blood collection kit approved by the Louisiana Department of Public Safety.
"B-D Blood Alcohol Kits" or similar blood collection kits as approved will be made available to all law enforcement agencies by the Applied Technology Unit.
In State v. Tanner, the Louisiana Supreme Court held that a motion to suppress the evidence is available to question the admissibility of chemical test results that can result in the legal presumption of intoxication. 457 So.2d 1172. The Court in Tanner, supra, at 1174, reasoned as follows:
Generally, questions of admissibility, relevance and weight of evidence are properly resolved at trial on the merits, not by pretrial motions. See State v. Garnier, 261 La. 802, 261 So.2d 221 (1972). However, the evidence in question in this case, the results of a chemical test, can give rise to a presumption that the person was under the influence of alcoholic beverages. La.R.S. 32:662. This rebuttable presumption of intoxication can be used to satisfy the "under the influence of alcohol" element of the state's case in a driving while intoxicated prosecution. La.R.S. 14:98. Also, in negligent homicide prosecutions, the presumption can be used to establish the fact of intoxication from which the factfinder can determine criminal negligence. State v. Green, 418 So.2d 609 (La.1982). Consequently, it has been held that the wrongful introduction of a chemical analysis test result, which by law presumes a defendant to be intoxicated, is so prejudicial to the defendant that a resulting conviction cannot stand, even if there is other evidence of intoxication. State v. Morrison, 392 So.2d 1037 (La. 1980); State v. Goetz, 374 So.2d 1219 (La.1979); State v. Graham, 360 So.2d 853 (La.1978). In view of the vital role that the legal presumption plays in determining guilt and the highly prejudicial nature of chemical test results if wrongfully introduced, it would serve the orderly administration of justice and further insure the defendant a fair trial if the admissibility of the test results could be determined in a pretrial proceeding.
*497 In the hearing to determine the admissibility of the blood test results, the State bears the burden of showing that the State has promulgated procedures to insure the integrity and reliability of the chemical test and that the State has strictly complied with the officially promulgated procedures. State v. Gregory, 403 So.2d 1225 (La.1981). In State v. Tanner, supra at 1175 the Court discussed this criteria:
When the legislature authorized the chemical analysis of a motorist's blood and created a statutory presumption of intoxication in the event that his blood contained the requisite percent of alcohol, it conditioned the validity of the chemical test upon its having been performed according to methods approved by the Department of Public Safety. La.RS. 32:663. This court has repeatedly recognized the importance of establishing safeguards to guarantee the accuracy of chemical tests. In a criminal prosecution, before the state may avail itself of the statutory presumption of defendant's intoxication, arising from chemical analysis of his blood, without violation of his constitutional due process guarantee of a fair trial, it must show that the state has promulgated detailed procedures which will insure the integrity and reliability of the chemical test, including provisions for repair, maintenance, inspection, cleaning, certification, and chemical accuracy. It must also show that the state has strictly complied with the promulgated procedures. State v. Krause, 405 So.2d 832 (La.1981); State v. Morrison, supra; State v. Goetz, supra; State v. Graham, supra; State v. Jones, 316 So.2d 100 (La.1975). Since it is permissible for the state to use the statutory presumption of intoxication in negligent homicide prosecutions, the same rigid admissibility requirements that exist in DWI cases must be satisfied in the instant case. See State v. Green, supra.

The courts may take judicial notice of the rules promulgated in the State Register regarding testing procedures and methods to be followed in chemical analysis. R.S. 49:966. State v. Corkran, 448 So.2d 1346 (La.App.3rd Cir., 1984). Thus it is not necessary for the State to actually introduce into evidence a copy of the methods for chemical analysis approved by the Department of Public Safety in order to satisfy its obligation of proving that the "State has promulgated procedures to insure the integrity and reliability of the chemical test." State v. Corkran, supra.
At the time of this incident the regulations governing acceptable techniques for blood alcohol analysis were those published in Volume 6, No. 11 of the Louisiana Register of 1980. Although the State did not present proof of the fact that it had promulgated procedures to insure the integrity and reliability of the chemical test this obligation could have been satisfied by the trial court's cognizance of the rules and procedure for such testing as promulgated in the State Register.
However, the State failed to present evidence showing that it had strictly adhered to the promulgated methods and procedures of chemical analysis in arriving at the test results which it intended to offer as evidence at the trial of the defendant. We interpret the Tanner decision, supra, as requiring the State to present this evidence at the hearing on the motion to suppress the evidence. This record is devoid of any evidence concerning the proper chain of evidence, the qualifications of the person conducting the test, the type of test utilized and whether the method of testing adhered to the acceptable methods or procedure promulgated by the Department of Public Safety.
Some of the deficiencies of proof, although not all inclusive, are as follows:
(1) Although the record refers to a "Dr. Muller" as the person who withdrew the blood sample from the defendant, he is not further identified by full name nor was it established that he was a physician or doctor of medicine or otherwise qualified as required by Louisiana Revised Statute Title 32 Section 664(A). (2) No evidence was introduced to show that replicate analysis *498 was performed in accordance with Section 12d of Volume 6 No. 11 of the Louisiana Register of 1980.
Accordingly, we find that the State failed to bear its burden of proving the admissibility of the results of the blood-alcohol test at the hearing on the motion to suppress the evidence, and the trial court erred in denying the defendant's motion to suppress the evidence.
Finding merit with the defendant's first assignment of error we do not consider the second assignment of error concerning illegal sentence.
For the reasons assigned the judgment of the district court on the motion to suppress the evidence is reversed, the defendant's conviction and sentence are vacated and the matter is remanded to the district court for further proceedings consistent with the opinion expressed herein.
JUDGMENT REVERSED, CONVICTION AND SENTENCE VACATED CASE REMANDED.
WILLIAMS, J., dissents.
NOTES
[1] The form was not admitted into evidence nor was it made a part of the trial court record.