833 So.2d 1125 (2002)
STATE of Louisiana, Appellee,
v.
John McKeithen MEREDITH, Appellant.
No. 36,483-KA.
Court of Appeal of Louisiana, Second Circuit.
December 11, 2002.
*1126 David E. Stone, Counsel for Appellant.
Richard Ieyoub, Attorney General, Terry R. Reeves, District Attorney, James E. Lewis, Assistant District Attorney, Counsel for Appellee.
Before WILLIAMS, KOSTELKA and HARRISON (Pro Tempore), JJ.
KOSTELKA, J.
John McKeithen Meredith ("Meredith") pled guilty to third offense driving while *1127 intoxicated, La. R.S. 14:98, reserving his right to appeal the denial of a motion to suppress in accordance with State v. Crosby, 338 So.2d 584 (La.1976). For the conviction, Meredith received a suspended sentence of three years at hard labor and was placed on five years' probation with a special condition that he serve one year in the parish jail. We vacate the plea, reverse the conviction and sentence and remand for further proceedings consistent with this opinion.

FACTS
At approximately 2:30 a.m. on the morning of August 15, 1997, Winnfield Police Officer Manuel Espejel ("Espejel") observed Meredith driving his pickup truck with no taillights. As Espejel prepared to stop the vehicle, Meredith made an abrupt turn into a gas station. Meredith exited the driver's side of his vehicle and approached Espejel who smelled the odor of alcohol on Meredith's breath. As Meredith spoke to Espejel, Meredith leaned against his truck for support. Espejel asked him if he had been drinking and Meredith stated that he had had two or three beers. Espejel then asked Meredith for a driver's license; Meredith possessed only an identification card. During these events, Louisiana State Trooper Michael Gilliam ("Gilliam") exited the gas station convenience store. At that time, Espejel informed Gilliam of his suspicion that Meredith was under the influence of alcohol and requested that Gilliam perform field sobriety tests, because Espejel was not qualified to do so. Gilliam conducted the field sobriety tests which Meredith failed. Espejel transported Meredith to the Winnfield City Police Department to conduct a breath test with an Intoxilyzer 5000. The result was a .134 percent blood alcohol level. On March 10, 1999, Meredith sought to suppress the test results urging that the officers failed to comply with the requirement that they observe him fifteen minutes prior to administering the breath test. After a hearing on August 24, 1999, the trial court orally denied the motion. However, on October 21, 1999, Meredith was allowed to submit further evidence on the issue of the time of observation. On June 9, 2000, the court again denied Meredith's motion to suppress. Subsequently, on March 28, 2002, Meredith pled guilty to DWI, third offense, reserving his right to seek review of the denial of his motion to suppress.

DISCUSSION
On appeal, Meredith solely argues that the trial court erred in denying his motion to suppress the Intoxilyzer results due to the officers' failure to observe him fifteen minutes prior to administering the test in accordance with Louisiana Administrative Code promulgated procedures.
In order for the state to avail itself of the statutory presumption of a defendant's intoxication arising from a chemical analysis of his blood, under La. R.S. 32:662, it must show that it has strictly complied with the promulgated procedures. State v. Rowell, 517 So.2d 799 (La. 1988); State v. Gregory, 403 So.2d 1225 (La.1981); State v. Goetz, 374 So.2d 1219 (La.1979); State v. Graham, 360 So.2d 853 (La.1978). A conviction obtained through chemical test legislation, which not only destroys a defendant's presumption of innocence but also severely restricts any possibility of a defendant proving his innocence, must be reversed if not accompanied by all of the safeguards designed to insure reliable chemical analysis. Graham, supra. A motion to suppress is available to question the admissibility of chemical test results that can result in the legal presumption of intoxication and the burden of proving admissibility is on the *1128 state. State v. Tanner, 457 So.2d 1172 (La.1984). The burden of proving the admissibility of the chemical test results is on the state as in the case of a confession or evidence seized without a warrant. Id.
Louisiana R.S. 32:663 provides that before a chemical analysis of a person's blood can be considered valid, it shall have been performed according to the methods approved and promulgated by the Department of Public Safety and Corrections.
Louisiana Admin. Code tit. 55, pt. I, § 513, promulgated in accordance with La. R.S. 32:663, sets forth the procedure for analysis using the Intoxilyzer 5000. Specifically, Section 513(A) provides for general observation of the subject for a period of not less than fifteen minutes prior to testing, whereby the subject shall not have ingested alcohol, alcoholic beverages, regurgitated, vomited or taken anything by mouth.
This regulation does not require constant observation by one individual for the requisite period of time prior to testing; all that is required is general observation that the subject had neither regurgitated nor ingested anything by mouth. State v. Clark, 446 So.2d 293 (La.1984); State v. Regan, 601 So.2d 5 (La.App. 3d Cir.1992), writ denied, 610 So.2d 815 (La. 1993). The purpose of the fifteen-minute observation is to attain accurate test results by ensuring that the subject has not consumed or eliminated any substance which could affect the blood alcohol level. Lewis v. State, DPSC, 601 So.2d 356 (La. App. 1st Cir.1992).
In this case, both Espejel's and Gilliam's testimony, and the documentation prepared by them, show that Meredith was first observed at approximately 2:29 a.m. At the very least, then, the officers were required to observe him until 2:44 a.m. Although the officers claim to have observed Meredith for the required time, discrepancies between their testimony and the documentation prepared by them exist. For example, both officers claimed to have observed Meredith for fifteen minutes during the initial confrontation. Yet, Espejel prepared an affidavit stating the time of arrest as 2:35 a.m. Additionally, that portion of the Uniform DWI Arrest Report ("Arrest Report") completed by Espejel indicates the time of arrest as 2:41 a.m. Espejel explained that this time referred to Meredith's being taken into custody after he failed the field sobriety tests. Obviously, either of these documented times contradicts the officers' testimony that they observed Meredith for fifteen minutes from the time they first observed him until he was arrested at the scene. An even more discrepant piece of evidence is the police log which indicated that the Intoxilyzer 5000 was "turn[ed] on" at 2:38 a.m., three minutes prior to the arrest time noted by Espejel on the Arrest Report. Both officers testified that Gilliam turned on the Intoxilyzer 5000 after they arrived with Meredith at the police station. Nor were the officers able to offer a satisfactory reconciliation of their testimony and the contrary documentation. Espejel surmised that the time discrepancy was due to the use of different watches. Gilliam could offer only that the affidavit time "might" be a misprint. Such generalized and conflicting evidence is sufficient only to raise questions rather than to prove how much time actually transpired between the officers' initial observation of Meredith and their arrival at the police station.
More challenging is the Intoxilyzer printout which shows the test time as 2:41 a.m. Obviously, if accurate, this evidence shows that the breath test was administered three minutes from the time that the machine was turned on and only twelve minutes from the time that Meredith was *1129 first observed at the scene. In these circumstances, the state was required to present evidence of a malfunction or inaccuracy in the Intoxilyzer clock in order to carry its burden. We cannot conclude that it has adequately done so.
At the hearing, Espejel stated that after their arrival at the police station, Gilliam turned the Intoxilyzer machine on and it took another fifteen minutes for it to warm up. Gilliam "believed" that he turned the machine on and that it took fifteen minutes for it to warm up. He felt that from the time he first saw Meredith until the time he administered the test, thirty minutes had transpired. Obviously, this testimony directly conflicts with documentation showing that the machine was turned on at 2:38 a.m. and the time of the test to be 2:41 a.m. Despite their general claims to have observed Meredith for fifteen minutes after the machine was turned on, it is apparent that neither Gilliam nor Espejel even noticed the discrepancy at the time of the test. This is evident from Gilliam's notation that the breath test was conducted at 2:41 a.m. on the Arrest Report and his failure to note any inaccuracy in the clock. Nor did either officer offer a possible explanation at the hearing for the time variances. In fact, at the hearing, Gilliam admitted that 2:41 a.m. was the time reflected on the Intoxilyzer 5000.
Gilliam's notation on the DWI rights form was the only evidence that could be construed to support the officers' position. This form indicated a time of 2:55 a.m. Gilliam explained that he filled in the time blank which reflected the time he read Gilliam his rights prior to administering the test. When questioned about where he got the DWI rights time, however, Gilliam was unable to say that he looked at his watch but just "knew" it was 2:55 a.m.
W.J. Bordelon, Jr. ("Bordelon"), a defense witness and employee of the Louisiana State Police Applied Technology Section who instructs officers on how to administer breath tests to DWI suspects, offered specific evidence of the accuracy of the Intoxilyzer 5000's clock. Based upon documentation prepared after the machine was certified on July 9, 1997, and Bordelon's personal inspection of it on November 5, 1997, Bordelon noted no relevant inaccuracy in the Intoxilyzer 5000 clock.[1] Bordelon explained that if any inaccuracy had existed, he would have taken the machine to Baton Rouge for evaluation. Bordelon testified that when the machine is turned off, the clock operates by battery; the clock circuit has nothing to do with the analysis of the sample. Bordelon also stated that he instructs officers to note any problems with the clock on the Intoxilyzer at the time the test is given in order to explain any discrepancies. He explained that a minimum of fifteen minutes is required for the machine to be ready for operation.
After considering this testimony and evidence, we cannot say that it is sufficient to carry the state's burden of proving strict compliance with the promulgated guidelines. Too many unexplained discrepancies exist between the officers' testimony and the documentation prepared by them. The fact remains that the documentary evidence shows only twelve minutes elapsed from the time that the officers first observed Meredith at 2:29 a.m. and the Intoxilyzer printout reflecting a test time of 2:41 a.m. Yet, the state presented no clear evidence refuting the clock's accuracy. Not only did the officers fail to note *1130 any discrepancy in the clock, but one of them relied upon it in that portion of the Arrest Report prepared by him. Direct evidence of the clock's accuracy came from a defense witness who certified the machine as correct. Nor can we say that in these circumstances, Gilliam's notation on the DWI rights form, i.e., that he read Meredith his rights at 2:55 a.m., is satisfactory to show that the officers observed Meredith for the required fifteen minutes. Not only was Gilliam unable to remember if he relied upon his watch for the time, but he inconsistently certified 2:41 a.m. as the correct test time on the Arrest Report. As such, his testimony both supports and contradicts the accuracy of the test. Such unresolved, inconsistent evidence is inadequate to satisfy the stringent burden required of the state in these circumstances. While we do not question the officers' integrity in this matter, we must conclude that the precision with which they undertook their duties fell below that which is required for the admission of these test results into evidence for the purpose of the presumption of Meredith's guilt. Accordingly, insofar as Meredith's chemical tests results were sought to be used by the state as presumptive evidence of his guilt, we find them inadmissible. See, Graham, supra; Tanner, supra. We, therefore, reverse the trial court and grant Meredith's motion to suppress. This opinion in no way addresses whether or not the test results may be used in a trial in accordance with State v. McElroy, 553 So.2d 456 (La.1989); State v. Honeyman, 560 So.2d 825 (La.1990), i.e., as circumstantial evidence that would allow the fact-finder to draw an inference of intoxication. Because Meredith has reserved his rights and conditioned his plea of guilty under the aegis of Crosby, and we find merit in his claim, we vacate the plea and remand for further proceedings in accordance with this opinion.
GUILTY PLEA VACATED, REVERSED AND REMANDED.
NOTES
[1] Bordelon testified that he corrected an hour difference in the clock time on November 5, 1997, due to the time change to central standard time which had occurred shortly before his inspection.