517 So.2d 799 (1988)
STATE of Louisiana
v.
James R. ROWELL.
No. 87-KK-0938.
Supreme Court of Louisiana.
January 18, 1988.
Joseph Jordan, Jr., Lafayette, for applicant.
William J. Guste, Jr., Atty. Gen., J. Nathan Stansbury, Dist. Atty., David Hutchins, Asst. Dist. Atty., for respondent.
MARCUS, Justice.
James R. Rowell was charged by bill of information with operating a motor vehicle while under the influence of alcohol, second offense, with a blood alcohol concentration of 0.10% or more, in violation of La.R.S. 14:98. Defendant filed a motion to suppress the results of the blood alcohol analysis performed on the blood sample drawn from him after his arrest. A hearing on the motion was conducted in conjunction with trial on the merits. The trial judge first ruled that the burden was on defendant to prove the inadmissibility of the blood test results under La. Code Crim.P. art. 703.[1] At the conclusion of trial, the trial judge denied the motion to suppress finding that the Department of Public Safety's regulations on blood alcohol analysis were adequate to insure the accuracy of the test results and found defendant guilty as charged. The court of appeal granted defendant's application for a writ of review and reversed his conviction and sentence finding that the trial judge erred in placing the burden on defendant to prove the inadmissibility of the results of the blood alcohol analysis. The court further concluded that the state could not meet its burden of proving that the regulations insured the integrity and reliability of blood alcohol analyses because the regulations did not contain provisions for repair, maintenance, inspection, cleaning, certification, and *800 chemical accuracy.[2] On the state's application, we granted certiorari to review the correctness of that decision.[3]
On May 17, 1986, defendant was involved in an automobile accident during which he collided into the rear of a garbage truck. When the police officers arrived at the scene of the accident, defendant was lying in the grass several feet from his automobile and was bleeding from his nose and face. One of the investigating officers noticed a scent of alcohol on defendant's breath. First aid was administered to defendant and he was taken by ambulance to the hospital. After defendant was advised of his rights, he consented to a blood alcohol analysis. A licensed practical nurse drew two vials of defendant's blood using a B-D Blood Alcohol Kit Number 4990. She then gave the vials to a police officer who sealed them in the kit. Five days later, a forensic chemist employed by Acadiana Criminalistics Laboratory performed a gas chromatographic analysis on defendant's blood samples using an internal standard with a direct injection. The analysis showed defendant's blood alcohol level to be 0.12%, which is above the presumptive level of intoxication. La.R.S. 32:662(A)(1)(c).[4]
This court has repeatedly recognized the importance of establishing safeguards to guarantee the accuracy of chemical tests used in criminal prosecutions. In order for the state to avail itself of the statutory presumption of a defendant's intoxication arising from a chemical analysis of his blood under La.R.S. 32:662, it must show that the state has promulgated detailed procedures which will insure the integrity and reliability of the chemical test, including provisions for repair, maintenance, inspection, cleaning, certification, and chemical accuracy. It must also show that the state has strictly complied with the promulgated procedures. State v. Gregory, 403 So.2d 1225 (La.1981); State v. Goetz, 374 So.2d 1219 (La.1979); State v. Graham, 360 So.2d 853 (La.1978). A motion to suppress is available to question the admissibility of chemical test results that can result in the legal presumption of intoxication and the burden of proving admissibility is on the state. State v. Tanner, 457 So.2d 1172 (La.1984). These principles were set forth in cases involving breath testing. This is the first case in which we are called upon to review the sufficiency of the regulations on blood analysis.
La.R.S. 32:663 authorizes the Department of Public Safety to approve satisfactory techniques or methods to assure the accuracy of breath and blood alcohol analysis.[5] In contrast to the Department's regulations on breath analysis, those on blood analysis are meager. See 11 La.Reg. 256 (1985). A person seeking a permit to conduct blood analysis must have a Bachelor of Science in chemistry, physics, biology, zoology, medical technology, or a related field and must conduct proficiency testing set up by the state police crime laboratory. Permits are effective for a period of five years. Two methods are approved for blood alcohol analysis: gas chromatography, headspace sampling with internal *801 standard and gas chromatography, direct injection with internal standard. The regulations also provide for certain procedures and controls in conjunction with each batch of samples analyzed. 11 La.Reg. 259 (1985).[6]
Gas chromatography is based on the different rates at which components of a mixture pass through a stationary medium. It functions to separate and measure the different components of a mixture. The gas chromatograph consists of a heated column through which a stream of gas is passed at a steady rate. When a mixture is injected into the heated column, it evaporates immediately and its different components are carried through the column by the gas. Because different components of a mixture pass through the column at different rates, they are separated. As each component exits the column, it is detected and measured. In a blood alcohol analysis, the substances which are separated and measured are the ethyl alcohol present in the blood sample drawn from an individual and a known amount of another species of alcohol (the internal standard) which has been added to the blood sample. The first step in the process is to calibrate the gas chromatograph by injecting an alcohol sample with a known concentration. Next, a blank sample containing only the internal standard is injected into the gas chromatograph to insure that it contains no ethyl alcohol. This demonstrates that the individual's blood sample is not being contaminated by adding the internal standard. A calibration check is then run with known concentrations of alcohol. Finally, the internal standard is added to the blood sample and this mixture is injected into the gas chromatograph. The alcohol in the individual's blood sample and the internal standard are separated and exit the column individually. A detector attached to the end of the column senses the different substances as *802 they exit. This detection is recorded in the form of peaks on a graph. The individual's blood alcohol concentration is determined by comparing the peak representing the alcohol in his blood to the peak representing the known amount of alcohol (the internal standard).
In the instant case, the chemist who performed the blood analysis had a Bachelor of Science in Forensic Science. He followed the procedure set forth in the regulations. Although the regulations do not specify the type of proficiency testing required to obtain a permit, the chemist testified that he obtained his permit in 1983 by analyzing four blood samples from the state police crime laboratory. He also testified that the gas chromatograph is not routinely inspected or maintained. When the gas chromatograph malfunctions, he repairs it; if unable to do so, he contacts the manufacturer of the machine. In addition, the chemist testified that if no preservative had been placed in the vials of blood, alcohol could be manufactured if the proper enzymes were present. Finally, he testified that the chemicals used to calibrate the gas chromatograph were not spot-checked for standard quality and admitted that if the calibration standard were off an error in the analysis would occur.
The regulations concerning the qualifications of a person seeking a permit to conduct blood analysis are insufficient because they do not specify the type of proficiency testing required. Moreover, the regulations do not provide for the repair, maintenance, or inspection of the gas chromatograph. Although the chemist who performed the blood analysis in the instant case testified that he was able to perform some repairs, the regulations do not require a person seeking a permit to have such skills. In view of the chemist's testimony that alcohol can be manufactured in the blood sample if it is not properly preserved, the regulations do not sufficiently provide for the preservation of the blood sample. Finally, the regulations are not sufficient to insure the accuracy of the chemicals used to calibrate the gas chromatograph. Accordingly, we agree with the court of appeal that the state failed to meet its burden of proving that the regulations insured the integrity and reliability of blood alcohol analyses because they did not contain provisions for repair, maintenance, inspection, cleaning, certification and chemical accuracy.[7]
This court has held that the wrongful introduction of a chemical test result, which by law presumes a defendant to be intoxicated, is so prejudicial to the defendant that a resulting conviction cannot stand even if there is other evidence of intoxication. Tanner, 457 So.2d at 1174. Because this decision does not entail a finding that there was an insufficiency of evidence to convict defendant, but only that the admission of the gas chromatography test results was erroneous, it is proper that defendant be retried on the charge of driving while intoxicated, second offense. State v. Morrison, 392 So.2d 1037 (La. 1980).

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed and amended to specify that the remand to the district court be for a new trial.
WATSON, J., dissents.
NOTES
[1] Nonetheless, the state volunteered and did go forward with direct examination of the witnesses and defendant was allowed to cross-examine them.
[2] 505 So.2d 978 (La.App.3d Cir.1987).
[3] 506 So.2d 1216 (La.1987).
[4] La.R.S. 32:662(A)(1)(c) provides:

A. The chemical test or tests as provided for by this Part shall be subject to the following rules and shall be administered as provided for hereafter:
1. Upon the trial of any criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a vehicle while under the influence of alcoholic beverages the amount of alcohol in the person's blood at the time alleged as shown by chemical analysis of the person's blood, urine, breath or other bodily substance shall give rise to the following presumptions:
c. If there was at that time 0.10 per cent or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcoholic beverages.
[5] When defendant's blood sample was drawn, La.R.S. 32:664 provided that only a physician, registered nurse, qualified technician or chemist could withdraw blood for the purpose of determining its alcohol content. By Act No. 263 of 1986, the legislature deleted qualified technicians and chemists as persons authorized to withdraw a blood sample to be used by the state in a criminal prosecution.
[6] Sections 2-6 of the Certified Techniques of Analysis provide:

Section 2. Procedures shall include the following controls in conjunction with each batch of samples analyzed:
Section 2.1 A system blank analysis.
Section 2.2 Analysis of a suitable reference or control blood sample of known alcohol content within the range of 0.000 to 0.30g percent, the result of which analysis must coincide with the known blood alcohol value of the reference specimen within 0.010g percent if validity is to be assigned to the results for the batch analyzed.
Section 3. Replicate analysis shall be performed in order to minimize the possibility of undetected errors.
Section 4. Results shall be expressed in terms of percent W/V (g percent) that is, grams of alcohol per 100 milliliters of blood, rounded downward to the second decimal place; for example, 0.237g percent found shall be reported as 0.23g percent.
Section 5. Analytical procedures for determining alcohol in blood shall meet the following performance requirements:
Section 5.1 The accuracy and sensitivity of the procedure shall be such as consistently to attain results within 0.01g percent of the known value over the range of 0.00 to 0.30g percent in analyses of appropriate reference materials of known ethyl alcohol concentration.
Section 5.2 The precision of the procedure shall be such as consistently to attain a reproducibility not greater than 0.005g percent in replicate analyses.
Section 5.3 The blank values yielded by the procedure in analyses of alcohol-free blood specimens consistently shall be not greater than 0.01g percent.
Section 5.4 The specificity of the procedure shall be adequate and appropriate for the analysis of biological specimens for the determination of the blood alcohol concentration in traffic law enforcement and highway crash investigations.
Section 5.5 Procedures for the analysis of biological specimens from living subjects shall respond only to ethyl alcohol and the other lower aliphatic alcohols and should not be susceptible to significant unrecognized interference by other substances.
Section 5.6 Procedures for the analysis of postmortem biological specimens shall respond only to ethyl alcohol and shall not be susceptible to significant unrecognized interference by other substances.
Section 6. Blood drawn for the purpose of determining the alcoholic content therein shall have been taken with the contents of the "B-D Blood Alcohol Kit" Number 4990 or 4991 for postmortem determination (manufactured by Becton-Dickinson Division of Becton, Dickinson and Company, Rutherford, New Jersey), or similar blood collection kit approved by the Louisiana Department of Public Safety and Corrections. "B-D Blood Alcohol Kits" or similar blood collection kits as approved will be made available to all law enforcement agencies, by Louisiana State Police.
11 La.Reg. at 259-60
[7] Because of this conclusion, we need not address defendant's remaining assignments of error.