KLIEBERT, Judge.
Defendant, Dean Benoit, was charged with vehicular homicide, a violation of LSA-R.S. 14:32.1,[1] following an automobile accident on Interstate 55 which resulted in two deaths. Defendant moved to suppress the results of a blood test administered following the accident and of statements made to State Trooper Van Penouilh. Following an evidentiary hearing, the trial court denied the motion to suppress. Defendant applied to this Court for supervisory writs.[2] We granted a writ of review and ordered the entire record lodged with this Court and upon lodging directed our *491 clerk to set the case for briefing and argument on our regular appellate docket. For the following reasons we affirm in part, reverse in part, and remand.
MOTION TO SUPPRESS STATEMENTS
Here, defendant alleges the trial court erred in denying the motion to suppress statements made to Trooper Penouilh because defendant was in a state of shock following the accident and therefore could not make a knowing and intelligent waiver of his constitutional rights against self incrimination.
Before a confession or inculpatory statement can be introduced into evidence, the state has the burden of affirmatively proving that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. LSA-R.S. 15:451. State v. Ordonez, 395 So.2d 778 (La.1981). It must also be established that an accused who makes a confession during a custodial interrogation was first advised of his constitutional rights as per Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and voluntarily and intelligently waived those rights. State v. Castillo, 389 So.2d 1307 (La. 1980), cert. denied, Castillo v. Louisiana, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981); State v. Toups, 499 So.2d 1149 (La.App. 5th Cir.1986), writ denied, 501 So.2d 772 (La. 1987).
Whether a showing of voluntariness has been made is analyzed on a case by case basis with regard to the facts and circumstances of each case. The trial judge must consider the “totality of the circumstances” in deciding whether the confession/statement is admissible. State v. Shepherd, 449 So.2d 1120 (La.App. 5th Cir.1984). The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of testimony relating to the voluntariness of a confession are entitled to great weight and will not be overturned on appeal unless they are not supported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Toups, supra; State v. Beck, 445 So.2d 470 (La.App. 2nd Cir.1984), writ denied, 446 So.2d 315 (La.1984).
Defendant claims his state of mind following the accident prevented a knowing and intelligent waiver of his constitutional rights. The testimony at trial reveals otherwise.
Although Trooper Penouilh found defendant to be in “sort of shock stage” while in the ambulance shortly after the accident, an interrogation did not occur and defendant offered only an exculpatory statement. About one hour later at River Parishes Medical Center, defendant was advised of his rights before being questioned. Trooper Penouilh and Dr. William Schoo-ley [3] both testified defendant was lucid and appeared to understand his rights as per Miranda and alcohol testing after being explained same by the officer. We find no evidence of record to suggest otherwise.
Therefore, we find any statements obtained at this time were made after defendant made a knowing and intelligent waiver of his constitutional rights. Accordingly, we hold the trial court properly denied defendant’s motion to suppress statements.
MOTION TO SUPPRESS BLOOD ANALYSIS RESULTS
Defendant argues the trial court erred in denying his motion to suppress the blood test results because:
1) The driver of the other vehicle was not asked to take an alcohol test;
2) There was no clearly established chain of evidence with regard to the delivery and handling of the blood kit used and,
3) The State’s failure to establish and/or adhere to reasonable, promulgated procedures with regard to blood analysis and/or the repair, maintenance or inspection of gas chromatographs used by the state under the ruling of State v. Rowell, 517 So.2d 799 (La.1988).
In State v. Rowell, supra, the Louisiana Supreme Court affirmed the Third Circuit Court of Appeal’s reversal of the trial *492 court’s denial of defendant’s motion to suppress results of a blood test which established a presumption the defendant was driving while intoxicated. In doing so, the Supreme Court, at page 800, stated:
“In order for the state to avail itself of the statutory presumption of a defendant’s intoxication arising from a chemical analysis of his blood under La.R.S. 32:662, it must show that the state has promulgated detailed procedures which will insure the integrity'and reliability of the chemical test, including provisions for repair, maintenance, inspection, cleaning, certification, and chemical accuracy. It must also show that the state has strictly complied with the promulgated procedures.”
In response to Rowell, supra, the Department of Public Safety (DPS) changed its 1985 regulations (in effect at the time of Rowell) and promulgated new rules and regulations concerning blood alcohol analysis which are contained in the June 1988 Louisiana Register.[4]
In State v. Allison, 554 So.2d 262 (La. App. 3rd Cir.1989), the Third Circuit was called upon to interpret the June 1988 regulations promulgated by DPS in response to Rowell, supra. In upholding the admissibility of a blood test, the court found the new regulations[5] sufficient, stating:
“In June 1988, new regulations were promulgated in an attempt to correct the problems pointed out in the Rowell case. See 14 La.Reg. 360. These regulations now provide in detail for certification testing for applicants to perform blood analyses. 55 L.A.C. 1.599. These sections also provide for specific types of proficiency testing with periodic refresher courses. Provision has been made for repair, maintenance and inspection of the gas chromatograph. 55 L.A.C. 1.557. The new regulations specify-the quality of chemicals to be used for the analyses of a control blood sample in such a way as to insure the accuracy of the chemicals used to calibrate the gas chromato-graph. 55 L.A.C. 1.555, and 561. Finally, the regulations make specific provision for the preservation of the blood sample prior to testing. 55 L.A.C. 1.555(G)(1). Accordingly, we find the regulations, as amended, to be sufficient to insure the integrity and reliability of blood analyses.” Id. at p. 264
Although we agree the June 1988 regulations are better than the March 1985 regulations, we disagree with the Third Circuit. We believe and therefore hold the regulations do not go far enough to assure preservation of the blood sample prior to testing or sufficient provisions for the repair and maintenance of the machine and accuracy of the samples used in calibrating the machines.
The testimony at the suppression hearing held in this case indicates the accident occurred at approximately 1:26 A.M. Defendant’s blood was drawn at the hospital sometime after 2:45 A.M. The blood was properly placed in an approved B-D Blood Alcohol Kit Number 4990, then placed in a squad car where it remained until sometime later that morning when the kit was placed in Trooper Penouilh’s locker. It remained in the locker for three days before being brought to the crime lab.
In response to questions by the trial judge, concerning any precautions that should be taken with State Exhibit 4, (defendant’s blood sample) John Ricca, Jr., a Louisiana State Police Crime Lab toxicologist, who is certified to perform analyses of blood and in fact performed the tests on this defendant’s blood, stated “the only thing we state is that it shouldn’t be heated.” Dr. Schooley testified that heat could affect the blood but how, he could not say. Further, he stated blood is usually refrigerated when stored but, depending on the intended purpose for storing the blood, some samples can stay in room temperature “for a long time.”
Nowhere do the regulations provide precautions or guidelines for storing of the blood once placed in the approved kit. *493 Preservation of the blood is essential to insure a reliable test.
As defendant’s blood stayed in the police car until later that morning (possibly as late as 11:59 A.M.), then in a locker for three days, and, considering the testimony of possible effects of heat on the blood, the regulations do not sufficiently provide for the preservation of the blood sample.
Additionally, there are no rules regulating the preparation and use of sample batches of blood/alcohol mixtures used to calibrate the gas chromatograph machine.
Here Mr. Ricca testified that he prepared the sample used to calibrate the machine. The analysis of defendant’s blood was performed on September 15, 1988. Mr. Ricca was certified on the day before, i.e., September 14, 1988. Mr. Ricca testified that he could have prepared the sample the first of the month, before his certification, but probably did not because he was not certified. Further, there is no procedure set forth on how to prepare the sample solution used for calibration. Mr. Ricca’s supervisor and others who worked for the crime lab developed the presently utilized procedure which goes back to 1974 or beyond.
The regulations are clearly void of any attempt to insure the reliability of calibration by setting forth procedures for preparing sample batches of blood/alcohol. This could easily result in false reports. The DPS regulations should be more detailed to avoid that possibility.
Further, although 55 L.A.C. 1.557 sets forth provisions for repair, maintenance, and inspection of the gas chromatograph; the provisions clearly allow excessive leeway so as to jeopardize the accuracy of any test results.
Maintenance, repair, and inspection may be performed by a certified blood alcohol analyst and may include, but is not limited to, cleaning, replacing septums, etc., and any other routine checks that are deemed necessary for accurate performance. 55 L.A.C. 1.557. Mr. Ricca testified he is authorized to and does perform maintenance on the machine. Although not being formally trained in repair and maintenance for the particular gas chromatograph, except for part of the 24-hour certification course, it is the crime lab policy that if something goes out in the instrument that the analyst is familiar with, he can fix it without calling a factory repairman. If, following certain daily checks on the instrument, the analyst feels the machine will not perform correctly, and he feels he cannot repair the instrument to operate correctly and accurately, then he will call a repairman.
Although providing for maintenance, repair and inspection, the regulations do not sufficiently safeguard the accuracy of the gas chromatograph by specifying what may be performed by the analyst and what must be performed by a qualified repairman. Thus, detailed procedures as required by Rowell have not been met.
For the foregoing reasons, we find the state has failed to meet its burden of proving the regulations insured the integrity and reliability of blood alcohol analyses because: (1) the regulations contain no provisions to assure preservation of the blood sample after it has been drawn, but before it is tested; (2) to assure the accuracy of the samples and to calibrate the machines; and (3) to assure the accuracy of repairs and maintenance of the machines. As a result, we need not consider defendant’s other two alleged errors.
For the reasons above stated, we affirm the trial court’s ruling denying defendant’s motion to suppress statements made to Trooper Penouilh, but we reverse the trial court’s ruling denying defendant’s motion to suppress blood test results and hold they are not admissible. Accordingly, the matter is remanded for further proceedings.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
WICKER, J., concurs in part.
APPENDIX I
§ 555. CERTIFIED TECHNIQUES OF ANALYSIS
A. The certified analyst shall inspect instrumentation and equipment immediately before analysis is begun to insure *494 that the instrument is operating properly and that test results will be accurate and within the tolerances indicated below.
B. The methods approved for alcohol analysis of blood are:
1. Gas Chromatography — Headspace sampling with internal standard.
2. Gas Chromatography — Direct injection with internal standard.
C. Procedures shall include the following controls in conjunction with each batch of samples analyzed:
1. a system blank analysis.
2. analysis of a reference or control blood sample of known alcohol content within the range .05 to .40g percent, the result of which analysis must coincide with the known blood alcohol value of the reference specimens ± O.Olg percent if validity is to be assigned to the results for the batch analyzed.
D. Replicate analyses shall be performed in order to eliminate the possibility of undetected errors.
E. Results shall be expressed in terms of percent w/v (g percent) that is, grams of alcohol per 100 milliliters of blood, rounded downward to the second decimal place, for example, 0.237g percent shall be reported as 0.23g percent.
F. Analytical procedures for determining the concentration of alcohol in the blood shall meet the following requirements:
1. The accuracy of the procedure shall be such as consistently to attain results within ± .Olg percent of the known value over the range .05 to 0.40g percent in analyses of commercially prepared standards of known alcohol concentration.
2. The precision of the analysis shall be such as consistently to attain a reproducibility not greater than ± 0.005g percent of the mean value in replicate analysis.
3. The values yielded by the procedure in analyses of alcohol-free reagents consistently shall be not greater than O.Olg percent.
4.Procedures for the analysis of whole blood from living and post mortem subjects shall differentiate ethyl alcohol from all other substances.
G. Blood drawn for the purpose of determining the alcoholic content therein shall have been taken with the contents of a sealed “B-D Blood Alcohol Kit” Number 4990 or 4991 (manufactured by Becton-Dickinson Division of Becton-Dickinson and Company) or a similar blood collection kit approved by the Louisiana Department of Public Safety and Corrections. “B-D Blood Alcoholic Kits” or similar blood collection kits as approved will be made available to all law enforcement agencies by the Louisiana State Police.
1. All kits approved by this department shall contain the necessary preservatives to insure stability of the sample as provided by the manufacturer and contain no component which will interfere with the ethyl alcohol analysis of blood. Each approved kit must be manufactured specifically for blood alcohol determinations in living or post-mortem subjects.
2. Following analysis, the evidence will be stored for a period of one year by either the testing facility or the submitting agency and then may be destroyed.
H. Each laboratory performing blood alcohol analysis must submit to the Louisiana State Police Crime Laboratory for approval written procedures with regard to the following minimum standards:
I. Analysis must be performed on a gas chromatograph.
2. Any procedures for blood alcohol determinations as outlined in these rules and regulations shall be considered minimum standards.
3. Maintenance, repair and inspection must be in accordance with guidelines listed in § 557.
§ 557. MAINTENANCE, REPAIR AND INSPECTION
Maintenance, repair and inspection of a gas chromatograph may be performed by a certified blood alcohol analyst. This may include but not be limited to cleaning, replacing septums, changing col *495 umns, checking gases and flow rates, adjusting temperature settings, and any other routine checks that are deemed necessary for accurate performance. Following each maintenance or repair, inspection of the instrument shall include running a known alcohol standard to insure that the instrument is in proper working order.
A log book listing all repair work, maintenance and inspection shall be kept and will be available for inspection. The minimum information required in the log book shall state the date, time, nature of work, and name of person(s) performing task.
§ 561. QUALITY OF GLASSWARE AND SUPPLIES
All non-disposable glassware used in the blood alcohol analyses and standard calibration solutions must be cleaned with non-alcoholic detergents and must be free of any foreign residue.
B. All disposable supplies must be clean and contain no interfering substances which could affect the blood alcohol analysis test.
C. All chemicals used shall be at least reagent grade.

. LSA-R.S. 14:32.1 defines vehicular homicide and provides as follows:
A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, vessel, or other means of conveyance whether or not the offender had the intent to cause death or great bodily harm whenever any of the following conditions exist:
(1)The offender is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
(2) The offender’s blood alcohol concentration is 0.10 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.
(3) The offender is under the influence of narcotic drugs, central nervous system stimulants, hallucinogenic drugs, methaqualone, or barbiturates and such condition was a contributing factor to the killing.

. Writ No. 90-K-231.

. Dr. Schooley was the emergency room physician who treated the defendant.

. See 14 La.Reg. 360 (1988).

. Section 555 of the June 1988 regulations are attached as Appendix I.