947 So.2d 774 (2006)
STATE of Louisiana
v.
Houston BELL.
No. 2005-KA-0808.
Court of Appeal of Louisiana, Fourth Circuit.
December 6, 2006.
*775 Eddie J. Jordan, Jr., District Attorney, Graham L. Bosworth, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
C. Gary Wainwright, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY).
MICHAEL E. KIRBY, Judge.
STATEMENT OF CASE
On December 13, 2002, Houston Bell was charged with one count of vehicular homicide. At his arraignment on January 8, 2003, he pled not guilty. On February 18 the court denied his motions to suppress the evidence and statement. The State subsequently filed a motion in limine to prohibit reference to correspondence written by a State's witness, and the court granted this motion on September 19, 2003. The court called the matter for trial on March 18, 2004. Prior to the start of trial, the court took victim impact testimony, and then Bell filed a motion in limine to prohibit the State from using the statutory presumption of intoxication, as well as a motion in limine to invoke his physician/patient privilege. The court denied both motions, and Bell then entered a plea of guilty as charged under State v. Crosby, 338 So.2d 584 (La. 1976), reserving his right to appeal the trial court's rulings. The court ordered a presentence investigation. On October 7, 2004 the court sentenced Bell to serve seven years at hard labor without benefit of parole, probation, or suspension of sentence. Bell objected at that time, and on October 15, 2004 he *776 filed a motion to reconsider sentence, a motion to withdraw his guilty plea, and a motion for appeal. On January 14, 2005 the court denied the first two motions but granted the third. On April 18, 2005 the court granted a motion to reconsider sentence, to which the State made no objection. The court modified Bell's sentence to order that his seven-year sentence at hard labor be served without the benefit of parole for only the first two years.
FACTS
Because this case did not go to trial and the transcript of the suppression hearing is unavailable due to Hurricane Katrina, the facts have been gleaned from the police report and the transcripts of other hearings contained in the record.
At approximately 11:30 a.m. on October 11, 2002, Houston Bell was driving on the I-10 Service Road in eastern New Orleans near Bullard Avenue. Bell's car crossed the center line and collided with a car being driven by John Bunch, who worked at a nearby car dealership. Within an hour Bunch was taken to the hospital, where he died of internal injuries, including a ventricular tear. Officers responding to the scene found Bell staggering. He failed field sobriety tests. After being advised of his rights, Bell admitted that he had worked overnight prior to the accident and that he had spent time drinking in a bar after getting off work at 8:00 a.m. He also admitted he had taken Lortab, a narcotic, prior to the accident. The officers took him to a hospital where a blood sample was drawn and then transported him to Central Lockup.
DISCUSSION
A. Errors Patent
A review of the record reveals one patent error. The transcript of sentencing shows that the trial court did not impose the fine of not less than $2,000 nor more than $15,000 as mandated by La. R.S. 14:32.1. Thus, we remand the case for imposition of the fine. See State v. Williams, XXXX-XXXX (La.App. 4 Cir. 10/6/03), 859 So.2d 751, writ den. State ex rel. Williams v. State, XXXX-XXXX (La. 11/28/05), 916 So.2d 133; State v. Jefferson, XXXX-XXXX (La.App. 4 Cir. 12/21/05), 922 So.2d 577; State v. Brown, 2003-2155 (La.App. 4 Cir. 4/14/04), 895 So.2d 542.
There are no other patent errors.
B. Assignments of Error

I.
By his first assignment of error, the appellant contends that the trial court erred by denying his motion in limine to prevent the State from using the statutory presumption of intoxication as set forth in La. R.S. 14:32.1 to prove its case.[1]
At the time of the offense La. R.S. 14:32.1 provided in pertinent part:
A. Vehicular homicide is the killing of a human being . . . caused directly by an offender engaged in the operation of . . . any motor vehicle . . . whether or not the offender had the intent to cause death of great bodily harm, whenever any of the following conditions exists:
* * *
(2) The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.
Appellant's blood alcohol content was 0.21 percent according to the report of the crime laboratory.
*777 The operator of a motor vehicle on a public road is deemed to consent to a chemical test of his blood, breath, urine, or other bodily fluid to determine the presence and content of alcohol or any controlled dangerous substance where the person is arrested for being under the influence and driving or being in actual physical control of the vehicle. La. R.S. 32:661. The results of such chemical tests may be used as a presumption of intoxication provided the Department of Public Safety has approved the testing methods used in the chemical analysis of a suspect's blood, breath, urine, or other bodily substance. La. R.S. 32:662, La. R.S. 32:663.
Courts have long held that to utilize the statutory presumption of intoxication as set forth in La. R.S. 32:662, the State must show that the Department of Public Safety has established regulations for the chemical testing of bodily fluids that guarantees that the results of testing will be accurate and that in the particular case the applicable regulations were followed. State v. Barker, 629 So.2d 1119 (La. 1993); State v. Graham, 360 So.2d 853 (La. 1978); State v. Rowell, 517 So.2d 799 (La. 1988); State v. Fairleigh, 490 So.2d 490 (La.App. 4 Cir. 1986). In Rowell and in State v. Fairbanks, 531 So.2d 1145 (La.App. 4 Cir. 1988), the courts found that the State could not use the statutory presumption because the regulations promulgated by the Department of Public Safety did not guarantee that the results of testing would be accurate. In Graham and in Fairleigh, the State failed to show that it had followed the regulations. In State v. St. Amant, 504 So.2d 1094 (La.App. 5 Cir. 1987), the court found that the State failed to present evidence as to both the regulations promulgated by the Department of Public Safety and as to the tester's adherence to these regulations. The Court found the State was not entitled to utilize the presumption in State v. Gregory, 403 So.2d 1225 (La. 1981) because the State did not show that those who performed the maintenance checks on the equipment used in the test were certified by the Department of Public Safety.
We have found only one case where an appellate court upheld the State's use of the presumption of intoxication, even though the State did not show complete technical compliance with the regulations. State v. Wells, 559 So.2d 531 (La.App. 2 Cir. 1990). There the defendant sought to reverse his conviction based upon the State's use of the statutory presumption because the person who conducted the test had an outdated title. The appellate court rejected this argument, noting that this discrepancy was an "inconsequential departure" from the regulations in that the technician possessed all of the qualifications required by the regulations.
Appellant argues that the trial court should have suppressed the test results in this case because his blood sample was not tested until fourteen days after it was drawn. He argues that since the sample was not timely tested it could not be used to support the presumption. To make this argument he relies on 55 La. ADC Pt. I, § 555, which sets forth the certified techniques to be used by the analyst. Appellant points out that § 555G(3) provides:
The blood sample taken for analysis may be maintained at room temperature and delivered to the designated collection site of each enforcement agency within 24 hours of the end of the collecting officer's shift. It shall be transported then to the laboratory utilized for analysis at the earliest opportunity after collection, not to exceed seven days.
The State counters appellant's argument asserting he misinterprets § 555(G)(3) to mean that a blood sample must be tested within seven days. The *778 State reads the regulation to means only that the sample be transported within seven days.
Our task, then is to divine whether "not to exceed seven days" modifies "transported" or "for analysis."
Statutes that authorize the imposition of a penalty are to be strictly construed. [citation omitted] the meaning of a law must first be sought in the language employed. If that is plain, it is the duty of the courts to enforce the law as written. [citation omitted] Thus, interpretation of any statute begins with the language of the statute itself. [citation omitted] Words of a law must be given their generally prevailing meaning. [citation omitted]. When the wording of a revised statute is clear and unambiguous, "the letter of it shall not be disregarded under the pretext of pursuing its spirit." [citation omitted]. Rather, the law must be applied as written, and no further interpretation can be made in search of the intent of the legislature. [citations omitted].
However, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole. [citation omitted]. Principles of judicial interpretation of statutes are designed to ascertain and enforce the intent of the legislature in enacting the statute. The fundamental question in all cases of statutory construction is legislative intent and the reasons that prompted the legislature to enact the law. [citation omitted] The legislative history of a statute and related legislation can provide a particularly helpful guide in ascertaining the intent of a statute. [citation omitted]
The statutory and jurisprudential rules for statutory construction and interpretation apply equally well to ordinances, rules and regulations. [citation omitted] An interpretation used by the state administrative agency may be persuasive. [citation omitted]

CAO v. Stalder, XXXX-XXXX, pp. 4-5, (La. App. 1 Cir. 5/6/05), 915 So.2d 851, 855.
We find this regulation ambiguous because as written it plausibly may be read as suggested by each side to this controversy. If one reads the words "to the laboratory utilized for analysis" as a unit, then the State's position seems well founded. On the other hand, it is equally possible to read the sentence such that the words "for analysis at the earliest opportunity after collection, not to exceed seven days" as the operative grammatical unit. In this circumstance, the defendant has the better argument. We find it impossible in this instance to enforce the regulation as written.
Thus, we turn to an examination of the context in which the words are used and the text of the law as a whole to see if we can resolve this dilemma. A review of the driving while intoxicated, vehicular homicide and implied consent statutes, as well as the regulations adopted pursuant to them, reveals a dearth of information regarding whether time is of the essence in conducting a blood alcohol analysis on a sample drawn from a suspect. The regulation in § 555(G)(1) does require the approved test-kit to contain a preservative to insure the stability of the sample. But for how long? The next subsection, § 555(G)(2), provides that following testing the evidence will be stored at room temperature for one year. But why? Certainly the sample might be needed at the trial of the accused. Is the sample preserved so that the defendant can have his own test performed on it? Perhaps this is the reason, but if that is the case, why would La. R.S. 32:664(B) provide the accused an opportunity to have a qualified person of his *779 own choice administer tests in addition to and contemporaneously with those performed at the instance of a law enforcement officer?
We are unable to discern from the words of this regulation and the context in which they are used whether the rule maker, the Louisiana State Police, intended for the transportation of the sample to the lab to occur within seven days of its having been drawn or whether it intended for the actual analysis to occur within that seven day period.
Thus, we are left to see if there is an administrative interpretation by the State Police which may be of some value in resolving this quandary. In this regard we have discovered the internet web site of the Louisiana State Police Crime Laboratory. See: www.lsp.org/crimelab.html# blood. In the section pertaining to blood alcohol testing there is a list of sixteen "Guidelines for Proper Submittal of Blood Alcohol Specimens." The thirteenth guideline states: "Samples must be submitted to the laboratory within seven days following the shift on which the sample was taken." None of the other guidelines addresses a time frame when the sample that is submitted must be analyzed. The use of the word "submitted" in the guideline clearly indicates to us that all that is required is delivery to the laboratory within seven days. The testing may occur at a later time.
This assignment has no merit.

II.
By his second assignment of error, the appellant contends that the trial court erred by granting the State's motion in limine to prohibit the defense from introducing for impeachment purposes letters written by Off. Tafaro to two women prisoners unrelated to this case. At the hearing on this motion, the State noted that the defense planned to introduce three letters to attack Off. Tafaro's credibility by showing his bias or corruption. The State noted that it intended to call Off. Tafaro as an expert, not a fact witness, and the letters, mostly of a prurient nature, would not show Off. Tafaro's bias or corruption as an expert, and they would be much more highly prejudicial than probative. Defense counsel countered that he intended to introduce these letters to attack Off. Tafaro's credibility and to show his "corruption" in that Off. Tafaro admitted in the letters that he was writing them while at work, and counsel noted that "corruption" included a person who was attending to personal matters instead of working during working hours. The court countered that it had sent personal e-mails during working hours, and it did not find that these letters were relevant to the quality of Off. Tafaro's work. The court noted that the "spicy" nature of the letters would make them more appealing to the defense, but this fact would not show "that his test results are inaccurate to the jury, unless you can prove that test results in this case suffered because his attentions were drawn to the letter writing as opposed to the scientific analysis, which I venture to say you cannot." The court noted that it would allow defense counsel to ask what Off. Tafaro was doing during the time he analyzed the blood sample. The court also noted that the main person to whom the letters were written, Robin Bunley, was convicted in his court and had a history of writing wild letters to various people, including the court itself. The court noted that it was denying the State's motion in part to allow the defense to cross examine Off. Tafaro on his qualifications and the competency of his chemical analysis in this case, but the defense was not allowed to use what the parties termed the "Bunley letters" to impeach the officer. *780 The court stated: "I'm not here to decide if [Tafaro's] guilty of corruption based on these spicy letters you call Penthouse forum . . . this Penthouse forum stuff, as far as I'm concerned, is an unadjudicated immoral act. The defense noted its objection and requested that the "Bunley letters" be sealed and placed in the record.
The appellant now argues that the trial court erred by granting the State's motion in limine because he needed them to counter the State's attempts to establish the reliability of Off. Tafaro's test results by showing that the officer was engaged in writing the letters instead of doing his work. He also argues that these letters speak of deficiencies in the crime lab where Off. Tafaro worked which the defense could have used to impeach his test results. Interestingly, the defendant did not make the latter argument at the hearing, and there is no indication in the transcript that these letters contained any reference to the working conditions at the lab during the particular time that Off. Tafaro was testing the appellant's blood. Although the court agreed to seal the "Bunley letters" and place them in the record, they are not in the record before us. The appellant argues that the trial court's ruling impinged upon his right of confrontation.
In State v. Huckabay, XXXX-XXXX, pp. 25-26 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1108, this court discussed a defendant's right to confront his accusers:
An accused is entitled to confront and cross examine the witnesses against him. La. Const. art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross examination of the State's witnesses. State v. Van Winkle, 94-0947, p. 5 (La. 6/30/95), 658 So.2d 198, 201-202. The trial court has the discretionary power to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, 96-0766 (La. 1/14/97), 688 So.2d 473; State v. Robinson, 99-2236, p. 6 (La.App. 4 Cir. 11/29/00), 772 So.2d 966, 971. It has been held that evidentiary rules may not supercede the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, 99-0023, pp. 18-19 (La. 1/26/00), 775 So.2d 1022, 1037. Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La. 10/19/99), 753 So.2d 801, 817.
La. C.E. art. 607 provides for the introduction of evidence for impeachment purposes:
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable *781 tendency to disprove the truthfulness or accuracy of his testimony.
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. [emphasis added]
However, as noted in C.E. art. 608 B: "Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required." As per La. C.E. art. 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The portion of La. C.E. art. 607 italicized above reiterates the relevancy test of La. C.E. art. 403, which provides that even if evidence is relevant, the court my exclude it if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." As noted in State v. Hall, XXXX-XXXX, p. 8 (La.App. 4 Cir. 3/19/03), 843 So.2d 488, 496, writ den. XXXX-XXXX (La.11/28/05), 916 So.2d 128.:
A trial court's ruling as to relevancy will not be disturbed absent a clear abuse of discretion. State v. Lewis, 97-2854 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004; State v. Badon, 95-0452 (La.App. 4 Cir. 11/16/95), 664 So.2d 1291. A trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect. See State v. Lambert, 98-0730 (La.App. 4 Cir. 11/17/99), 749 So.2d 739; State v. Brooks, 98-0693 (La.App. 4 Cir. 7/21/99), 758 So.2d 814.
In State v. Jefferson, XXXX-XXXX (La. App. 4 Cir. 12/21/05), 922 So.2d 577, the defendant sought to question a witness, a police officer, about an unrelated misdemeanor charge against him in another parish in order to impeach his credibility. The trial court refused to allow this questioning, and on appeal this court affirmed, finding that the possible relevance of this line of questioning was substantially outweighed by the potential prejudice, confusion of issues, or misleading of the jury that would be caused by the introduction of this evidence.
Likewise, in State v. Washington, 99-1111 (La.App. 4 Cir. 3/21/01), 788 So.2d 477, the defendant sought to introduce a newspaper article profiling one of the officers involved in the case who purportedly told the reporter that he "jacked" suspects all the time. The trial court granted the State's motion in limine to prohibit the introduction of this newspaper article. On appeal of the defendant's subsequent conviction, this court affirmed the trial court's ruling, finding that the court did not err by granting the State's motion in limine.
Here, even though the letters themselves are no longer available, the description of their contents given at the hearing on the State's motion in limine shows that their prejudicial effects would far outweigh *782 any probative value they would have. The fact that Off. Tafaro had written letters to female prisoners containing sexually-explicit stories would have no bearing on whether he accurately analyzed the appellant's blood sample. The appellant now argues that the letters would show that the reason Off. Tafaro was unable to analyze the appellant's blood sample until fourteen days had passed was because he was too busy engaged in writing letters to female prisoners. The defense did not make this argument at the hearing. He also argues that the letters contained Off. Tafaro's complaints about the "deficiencies" of the crime lab, its equipment, and its reagents, which would have cast doubt on his ability to properly analyze the blood sample. Again, however, the appellant did not make this argument at the hearing, and there is no indication in the description of these letters that the letters contained a detailed examination of the deficiencies of the crime lab. The main focus of the hearing on the State's motion was the prurient nature of the letters, which the trial court likened to unadjudicated immoral acts, which are not admissible as per La. C.E. art. 608 to impeach a witness' character. Given the avowed purpose of the introduction of the letters as set forth at the hearing on the State's motion in limine to prohibit the use of these letters, the trial court did not abuse its discretion by finding that the letters' marginal probative value would be substantially outweighed by the prejudice or misdirection that would result from their admission.
This assignment of error has no merit.

III.
By his final claim, the appellant contends that the trial court erred by denying his motion in limine wherein he asserted his physician/patient privilege concerning the blood sample taken from him. A physician took two blood samples from the appellant at the hospital after the accident, and the appellant maintains that the sample given to the police cannot be used for prosecutorial purposes because it was taken in furtherance of medical treatment. As noted above, the appellant filed this motion in limine just prior to pleading guilty reserving his rights under Crosby. Although there is no indication that there was any discussion of the matter or that the court ruled on it, the appellant states in his brief that the court denied the motion.
In support of his claim, the appellant cites State v. McElroy, 553 So.2d 456 (La. 1989), where the Court held that a blood sample taken by a doctor at a hospital in a DWI case was covered by the physician/patient privilege. However, subsequent to McElroy, the legislature enacted La. C.E. art. 510 C(2)(d), which provides:
C. (1) General rule of privilege in criminal proceedings. In a criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself, his representative, and his physician or psychotherapist, and their representatives.
(2) Exceptions. There is no privilege under this Article in a criminal case as to a communication:
* * *
(d) When the communication is a record of the results of a test for blood alcohol level or drugs taken from a patient who is under arrest, or who was subsequently arrested for an offense related to the test.
See State v. Marullo, XXXX-XXXX (La.3/10/06), 923 So.2d 638. In addition, *783 La. R.S. 32:666 mandates that a blood sample be taken from a defendant in any case involving operating a vehicle while intoxicated where a fatality has occurred.
Here, the victim was killed in the accident. As per La. R.S. 32:666 the officers were mandated to obtain a blood sample from the appellant, and as per La. C.E. art. 510 this sample is not covered by the physician/patient privilege. This claim has no merit.
Accordingly, for the reasons stated above we affirm appellant's conviction on his guilty plea and remand the case for imposition of the mandatory fine.
AFFIRMED AND REMANDED.
NOTES
[1] Although the motion in limine referred to the statutory presumption as 0.10 percent, the appellant acknowledges that the pertinent blood-alcohol limit was 0.08 percent. The appellant argues that this discrepancy has no effect on the merits of his argument.